FILED

2008 Feb-26  PM 01:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| THOMAS E. REYNOLDS, as | } | |
| Trustee of the Bankruptcy | } | |
| Estate of Elizabeth Picard, | } | |
| | } | CIVIL ACTION NO. |
| Plaintiff, | } | 07-AR-1516-S |
| | } | |
| v. | } | |
| | } | |
| CREDIT SOLUTIONS, INC., | } | |
| | } | |
| Defendant. | } | |

**MEMORANDUM OPINION AND ORDER**

Before the court is the motion of defendant, Credit Solutions, Inc. ("Credit Solutions"), to dismiss this action or, in the alternative, to compel arbitration. Elizabeth Picard ("Picard") was the originally named plaintiff. However, Thomas E. Reynolds ("Reynolds"), the trustee of Picard's bankruptcy estate, was later substituted as the proper party plaintiff.[1] On December 4, 2007, the court conducted an evidentiary hearing on the issue of whether Picard electronically signed a contract containing a valid arbitration clause with Credit Solutions. After careful consideration of the evidence admitted at the evidentiary hearing, the parties' briefs, and the relevant law, the court finds, for the reasons that follow, that Credit Solutions's motion is due to be denied.

---

[1] For purposes of this opinion, the court will treat Picard as if she were the plaintiff.

*Factual and Procedural History*

On December 13, 2006, Picard placed a phone call to Credit Solutions to inquire about its services. Credit Solutions is a debt settlement company that negotiates with unsecured creditors on behalf of its customers to lower the customers' debt loads and monthly payments. Credit Solutions charges as its fee 15% of the total amount of debt to be reduced. Picard had amassed a considerable amount of credit card debt. She researched different companies that offered services similar to those provided by Credit Solutions. She says that she decided to call Credit Solutions after making inquiries about the company with the Better Business Bureau and learning that it was featured on a national television network.[2] She also testified that one of her friends who is an attorney advised her to call Credit Solutions.

Picard had an approximately 45-minute phone conversation with Martin Englert ("Englert"), one of Credit Solutions's debt consultants. After Englert explained the nature of the Credit Solutions program, Picard gave Englert the names and numbers of the high-interest credit cards that she needed help paying off, along with the balance due and interest rate on each card. After indicating a desire to enroll in the program, Englert told Picard that she could enroll via the internet and sent her an e-mail

---

[2] In the complaint, Picard alleges that she became aware of Credit Solutions through a "television promotional advertisement" and by viewing the company's website. *See* Complaint, ¶9.

containing a username and password that would allow her to log-in to the Credit Solutions website. Picard initially denied ever having gone through this enrollment process; however, an audio recording of her phone conversation with Englert on December 13, 2006, played at the evidentiary hearing, revealed that Picard did, in fact, complete Credit Solutions's internet-based enrollment procedure.

Once Picard accessed the Credit Solutions website on her computer, she used the temporary username and password supplied by Englert to log-in to the electronic enrollment process. Next, at Englert's direction, she changed her username and password to something of her own choosing. Then, she viewed on her screen a document titled "agreement to do business electronically" and, in accordance with Englert's verbal prompts, clicked the "yes-I consent" icon at the bottom of the page. After agreeing in this fashion to do business electronically, Picard viewed a page that required her to confirm that Englert had entered her personal information correctly and to enter some additional information. Then, she was required to retype the account numbers and balances of the credit cards that she wished to include in the settlement program and to input her payment information, including her bank account number and routing number.

After she entered all of the required information, Picard was shown a page that said "please wait for your documents to be

3

electronically signed." Next, an 8-page document popped-up on the screen in Adobe Acrobat format. A warning to "read through this document carefully" appeared at the top of the screen. Once the agreement appeared on Picard's computer screen, the following exchange took place between Picard and Englert:

> Englert: Now, what you should see is a scroll bar. You're going to take that scroll bar and go slowly towards the bottom until you get page 7 of 8. What you're looking for is a black "X" with a little yellow box next to that that says "click here to sign." You move your mouse over it and click it once. And then give it a second, and it will go ahead and complete it for you.
> Picard: In just click on it (inaudible).
> Englert: Yeah
> Picard: Okay. Okay. Now what do I do?

Def.'s Ex. 4 at 31. Credit Solutions's electronic records indicate that 30 seconds elapsed between the agreement's appearance on Picard's screen and her clicking the "click here to sign" box. Def.'s Ex. 6. After electronically signing the document that contained the terms of the agreement between the parties, known as the "customer enrollment package," a link to a document called a "limited power of attorney" appeared. Englert told Picard to open the document, print it off, sign it at the bottom, and fax it back to him at Credit Solutions. Picard, thereupon, faxed the limited power of attorney to Credit Solutions and used the fax cover sheet as a scratch pad to write down the various debt reduction amounts that Englert had discussed and, according to Picard, promised. According to Cody Wray, Credit Solutions's IT director, the company needed a hard copy of the limited power of attorney in order to

facilitate the process of negotiating with creditors.

Picard alleges that Credit Solutions failed to provide the services it was obligated to provide. She contends that by the end of January 2007, she was receiving both phone calls from creditors advising her that she was in default because no payments had been received and letters from lawyers threatening to take immediate legal action if she did not immediately pay her outstanding balances. Picard alleges that her eventual defaulting on her credit card accounts was caused by Credit Solutions's failure to provide the services it promised. After allegedly being unable to get anyone at Credit Solutions to respond to her demands for information about the status of the debt settlement negotiations, Picard states that she rescinded the limited power of attorney on April 18, 2007. According to Picard, her filing a Chapter 7 petition for bankruptcy on May 21, 2007 was the direct result of Credit Solutions's failure to fulfill its contractual and statutory obligations. Picard filed her complaint in this court on August 22, 2007, alleging violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679 *et seq.*, breach of contract,[3] and fraud.

Credit Solutions's motion invokes an arbitration clause contained in the text of the customer enrollment package. The arbitration clause provides:

---

[3] In the complaint, Picard alleges that she had an oral contract with Credit Solutions. *See* Complaint, ¶40

> If there is any dispute between the parties arising out
> of this agreement, the parties agree to submit that
> dispute to binding arbitration under the auspices of the
> American Arbitration Association (AAA). If such
> arbitration is held under the auspices of any other
> organization, the arbitration will be held in accord with
> AAA rules to the extent possible. Binding arbitration
> means that both parties give up the right to a trial by
> jury and to appeal except for a narrow range of issues
> that may be appealed under Texas law. Discovery may be
> limited by the arbitrator.

Def.'s Ex. 4 ¶10. The agreement also contains a choice of law and
jurisdiction clause providing that:

> In the event of any dispute regarding this AGREEMENT
> including but not limited to service fees and costs.
> CLIENT and COMPANY agree that venue of resolution shall
> be in the county and city of Dallas, Texas. Both COMPANY
> and CLIENT agree that the laws of the State of Texas
> shall govern any disputes arising from this AGREEMENT.

Def.'s Ex. 4 ¶11. Initially, Picard argued that the arbitration
clause does not apply because she never signed an agreement of any
kind with Credit Solutions. Now, after the audio recording of her
phone conversation with Englert was introduced at the evidentiary
hearing, she argues that the arbitration clause is not applicable
because CROA operates to make the arbitration clause void and
because the agreement as a whole is rendered void under the
doctrine of fraud in the factum.

*Discussion*

The Federal Arbitration Act ("FAA") provides that written
agreements to arbitrate a dispute arising out of a transaction
involving interstate commerce are "valid, irrevocable, and
enforceable save upon such grounds as exist at law or in equity for

6

the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has interpreted § 2 of the FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements." *Mose H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983). Section 3 of the FAA requires a federal court in which a suit has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" to stay the action pending arbitration "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3. "Statutorily-created causes of action are no exception to the rule that arbitration agreements should be enforced according to their terms." *Cunningham v. Fleetwood Homes*, 253 F.3d 611, 617 (11th Cir. 2001). While the FAA preempts state law to the extent it treats arbitration agreements differently from other contracts, state law should be applied in determining whether a binding agreement came into being between the parties. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005); *see also Bess v. Check Express*, 294 F.3d 1298, 1306 (11th Cir. 2002) ("The FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically.").

Under Alabama law,[4] "[t]he party seeking to compel arbitration has the initial burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction involving interstate commerce." *Title Max v. Edwards*, -- So. 2d --, 2007 WL 1454456 at *2 (Ala. May 18, 2007). "Once the moving party meets this initial burden, the non-movant then has the burden to present evidence tending to show that the arbitration agreement is invalid or inapplicable to the case." *Id.* Based on the audio recording of Picard's phone conversation with Englert, the court has no difficulty in concluding that Picard did electronically sign[5] a contract containing an arbitration clause with Credit Solutions in connection with a transaction that involves interstate commerce.[6] In determining whether Picard has met her burden of showing that the arbitration agreement is invalid or inapplicable, the parties raise three pivotal issues: 1) whether CROA applies to this transaction, 2) whether CROA acts to void the arbitration clause, and 3) whether Picard's claim of fraud in the factum as to the contract as a whole should be considered by the court or by the arbitrator. The court will consider each issue in

---

[4] Both parties agree that Alabama law governs whether an agreement to arbitrate actually exists.

[5] "A record or signature may not be denied legal effect or enforceability solely because it is in electronic form." Ala. Code § 8-1A-7(a).

[6] Picard has conceded that her transaction with Credit Solutions involves interstate commerce. *See* Complaint, ¶5.

turn.

*1. Applicability of CROA*

Picard argues, in part, that her claims under CROA are not subject to arbitration because CROA operates to make the arbitration clause at issue void. Before reaching the issue of arbitrability, the court must determine whether CROA applies to the transaction. Credit Solutions admits that it did not comply with CROA, but argues that CROA does not apply to it because it is not a credit repair organization.

> CROA defines a "credit repair organization" as:
>
> (A) . . . any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--
>
> > (i) improving any consumer's credit record, credit history, or credit rating; or
> >
> > (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . .

15 U.S.C. § 1679a(3). The only aspect of the statutory definition in dispute is whether Credit Solutions represented, either expressly or impliedly, that its service would improve Picard's "credit record, credit history, or credit rating." Credit Solutions argues that it is in the debt settlement business, as opposed to the credit repair business. Picard points to two pieces of evidence to establish that Credit Solutions fits within CROA's definition of

a credit repair organization: (1) the representations made by Englert to Picard during their phone conversation and (2) statements found on Credit Solutions's website.

In explaining the Credit Solutions program to Picard, Englert made several statements about the effect the program would have on Picard's credit score. Specifically, Englert stated as follows:

> Englert: Now, understand no matter what you do, it will have an effect on your credit score in the short term, but **long term, this will be the best solution for you.**
>
> . . .
>
> Englert: Now, obviously since you're not making monthly payments, your payment history will suffer. But payment history is not the end all, be all credit card companies would have you believe. Payment history is only one-third of your credit score. So let's say that we pay off the first card eight months into the program. Well, **that card will stop negatively effecting your payment history at that point and will positively affect you immediately because of something called debt-to-income ratio.**
>
> . . .
>
> Englert: . . . So to make this simpler, **in the first year your credit can go down, but within six months of you being done with this program, it should be as good, if not better than it is now** if you pay everything else you owe on time.

Def.'s Ex. 14 at 9-15 (emphasis added). Englert's statements strongly suggest that one purpose of Credit Solutions's debt settlement program is to improve a client's credit score as compared to what it would be otherwise. By telling Picard that she can improve her debt-to-income ratio by paying off her credit card debt, Englert was suggesting that Picard's credit score would eventually improve over what it would have been had she not enrolled in the

program. Indeed, he said as much when he assured Picard that "long term, this will be the best solution for you."

Englert's statements are reinforced by representations from Credit Solutions's website.[7] One of the pages tells potential customers that "[t]here is no better solution to fixing your bad credit than Credit Solutions," and urges them to "[c]all one of our debt consultants and get rid of your credit problems today." Pl.'s Ex. 18. The same webpage contains the following statements:

- "Our service enables clients to save money and to repay debts while improving their credit score."
- "Our debt relief service can help you restore bad credit to a positive credit rating."
- "Our service repairs bad credit without a credit check."
- "Clearing debts can lead to better interest rates."
- "Watch your credit score rise through our service."

*Id.* Credit Solutions contends that these representations are immaterial because they come from a version of its website that was not viewable by the public until May of 2007, some five months after the events at issue in this case. However, whether a customer actually relied on particular statements is irrelevant to the determination of whether an entity falls under CROA's definition of a credit repair organization. What matters is whether the defendant represents itself as offering services with the express or implied purpose of improving a customer's credit history, rating, or

---

[7] The court cannot help but notice that defendant's name, Credit Solutions, suggests that the service it provides has something to do with providing solutions to credit problems.

record.[8] In ruling on similar issues in a different case, another judge of this court observed that:

> CROA does not have any requirement of reliance. According to the statute's plain language, it is enough that Plaintiff purchased Defendant's online service. In determining whether Defendant is a credit repair organization, the Court need not limit itself to only those webpages or statements which Plaintiff specifically recalls seeing. Rather, the Court may look to the entire nature of Defendant's business and the representations that it makes in order to arrive at a conclusion.

*Helms v. Consumerinfo.com, Inc.*, 436 F. Supp. 2d 1220, 1230 n.13 (N.D. Ala. 2005) (Hopkins, J.); *see also Zimmerman v. Cambridge Credit Counseling Corp.*, -- F. Supp. 2d --, 2008 WL 81288 at *16 n.18 (D. Mass. Jan. 7, 2008) ("CROA does not require reliance on an entity's representations in order for it to be considered a credit repair organization."). In any event, the information from the website is consistent with Englert's sales pitch to Picard.

Credit Solutions argues that it should not be considered a credit repair organization because CROA was only designed to address abuses by companies that advertise themselves as being able to correct or "repair" inaccurate entries on consumer credit reports, not companies, like itself, that merely promise to settle

_____

[8] Credit Solutions's reliance on the merger clause in the customer enrollment package as a way to neutralize Englert's comments and the representations made on its website is unavailing because Picard is not arguing that those representations create contractual obligations. Rather, Englert's comments and the statements from the website are being used by Picard to suggest that Credit Solutions's represents itself, either expressly or impliedly, as being able to provide a service that will improve a customer's credit score. A company that represents itself as being able to provide services that will improve credit scores cannot evade the requirements of CROA through the simple expedient of a boiler-plate merger clause.

debt. In support of this proposition, Credit Solutions principally cites to the opinions of the district courts in *Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d 969 (N.D. Ill. 2006) and *Hillis v. Equifax Consumer Services, Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006).

In ruling that the defendant debt settlement organization[9] did not qualify as a credit repair organization, the *Plattner* court recognized that "[t]he statutory definition of a credit repair organization is extremely broad." 422 F. Supp. 2d at 972. However, because it was concerned that applying the statutory definition according to its plain language would sweep in "any entity that suggests that its services or advice might ultimately result in an improved credit rating," the court looked to the purpose behind CROA and its legislative history in order to narrow the expansive terms Congress chose. *Id.* at 972-76. The court suggested that CROA did not apply to "entities whose activities are aimed at assisting consumers in developing 'creditworthy behavior' and paying their debts, which may result in improved actual credit as a **collateral consequence**, rather than as a program objective." *Id.* at 975

---

[9] The agreement between the plaintiff consumer and the defendant debt settlement company in *Plattner* contained a disclosure warning the consumer that "[i]t is understood that no representation about any aspect of your credit rating can be made. Depending upon circumstances, credit can be enhanced, damaged, or not be altered, but in any case, it is beyond the control or scope of this program." 422 F. Supp. 2d at 974 n.4. However, the agreement between Picard and Credit Solutions only required Picard to agree that Credit Solutions "had not represented it will assist CLIENT in the modification, improvement or correction of credit entries." Def.'s Ex. 4, ¶9. Notably, Credit Solutions's disclaimer does not mention representations about improving the customer's credit score.

(emphasis added).

The *Hillis* court also recognized that "the definition of a credit repair organization appears sweeping" and expressed concern that "most companies that market and sell services that touch on consumer credit matters could be [credit repair organizations]."[10] 238 F.R.D. at 511. The court relied, in part, on CROA's omission of a definition for the terms "credit record," "credit history," and "credit rating" to justify the consideration of "legislative history and other extrinsic evidence to aid in the task of interpretation." *Id.* at 512. Relying on CROA's legislative history, the court noted that "Congress sought to regulate a specific type of activity and guard against a particular type of harm--in short, services that purport to improve or repair adverse **historical, tangible, and displayable** data in a consumer's credit record." *Id.* at 513 (emphasis added).

This court respectfully declines to follow whatever relevant guidance is offered by *Plattner* and *Hillis* because they both stray from the plain language of CROA. Limiting CROA to those organizations whose primary purpose is credit improvement, as opposed to those who promise better credit as a collateral

---

[10] Rather than being a debt settlement company like Credit Solutions, the defendant in *Hillis* provided a service called "Score Power" that provided consumers with "an Equifax credit report, a FICO score based upon that credit report, an explanation of the primary factors that affected the credit score, . . . access to a FICO score simulator that allows consumers to see how certain actions such as paying down outstanding debt, filing for bankruptcy, or paying bills late may affect their credit scores over time." 237 F.R.D. at 494.

consequence of settling debt, has no basis in the language of §
1679a(3). *See Cortese v. Edge Solutions, Inc.*, 2007 WL 2782750 at
*7 (E.D.N.Y. Sept. 24, 2007) ("[T]here is nothing in CROA's
definition of credit repair organization that would lead this Court
to conclude [that] credit repair services must be the principal or
only services of the organization at issue."). There is also no
textual basis for limiting the reach of CROA to organizations that
deal with tangible, displayable, historical data, as opposed to
those organizations that merely promise future improved credit. *See
Zimmerman*, 2008 WL 81288 at *17 (rejecting the distinction between
backward-looking credit repair and forward-looking credit
improvement). In any event, it bears noting that, unlike the credit
counseling service at issue in *Hillis*, Credit Solutions does
provide a service that allegedly has the effect of improving a
customer's tangible, displayable credit report. By settling credit
card debt, thereby affecting the debt load reflected on a
consumer's credit report, Credit Solutions's service, if it works
as promised, results in a consumer's credit report and credit score
being altered and improved.

After consulting CROA's legislative history, the courts in
*Plattner* and *Hillis* came to the conclusion that Congress enacted
CROA to address a particular problem, namely the harmful conduct of
organizations that promise to clean-up a consumer's credit report
by removing accurate, non-obsolete information from the report or

encouraging consumers to use unethical tactics to deceive credit rating agencies. *Plattner*, 422 F. Supp 2d at 973; *Hillis*, 237 F.R.D. at 513-14. Both courts interpreted the statute's definition of "credit repair organization" with Congress' supposedly narrow purpose in mind.[11] However, even if CROA was not drafted with debt settlements organizations specifically in mind, the plain meaning of its language includes the type of debt settlement services offered to Picard by Credit Solutions. *See Baker v. Family Credit*

---

[11] The court notes that the "findings and purposes" section of CROA does not provide any indication of the narrow purpose suggested in *Plattner* and *Hillis*:

a) Findings

The Congress makes the following findings:

(1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers

(2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

(b) Purposes

The purposes of this subchapter are--

(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

(2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679.

*Counseling Corp.*, 440 F. Supp. 2d 392, 404 (E.D. Pa. 2006) ("Simply because an organization purports to offer a 'debt management plan' to reduce a consumer's credit rates and payments does not mean that the organization cannot be held liable under CROA."). As noted by the court in *Zimmerman*, "it would betray the statute's intent to confine CROA's reach to only those practices that Congress explicitly identified in enacting it." 2008 WL 81288 at *17 n.20.

In interpreting a statute, the court begins with the language of the statute. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S. Ct. 941, 950 (2002). If the language of the statute is unambiguous, the court's inquiry should go no further. *BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183, 124 S. Ct. 1587, 1593 (2004); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98, 123 S. Ct. 2148, 2153 (2003) ("[W]here, as here, the words of the statute are unambiguous, the judicial inquiry is complete.") (internal quotations and citations omitted). A court should "resort to legislative history only when necessary to interpret ambiguous statutory text." *BedRoc*, 541 U.S. at 187 n.8, 124 S. Ct. at 1595 n.8; *see also CBS v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001) ("Where the clear and unambiguous language of a statute provides a bridge to Congress' intent, we will not and need not wade into the brackish waters of legislative history."); *United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1998) ("Review of legislative history is unnecessary unless a statute is

inescapably ambiguous.") (internal quotations and citations omitted). "It is not the function of the courts to amend statutes under the guise of 'statutory construction.'" *Fedorenko v. United States*, 449 U.S. 490, 514 n.35, 101 S. Ct. 737, 751 n.35 (1981). When the language of a statute is "plain and unequivocal, judicial construction is not only unnecessary but is forbidden." *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1088 (11th Cir. 2004) (internal quotations and citations omitted).

The court declines to examine CROA's legislative history because the language of 15 U.S.C. § 1679a(3)(A) is clear and unambiguous. Concern that CROA may apply to more organizations and activities than originally contemplated by its drafters does not open the door to ignoring the plain meaning of the words actually used. It has been recognized that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79, 118 S. Ct. 998, 1002 (1998). "'[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689, 121 S. Ct. 1879, 1897 (2001) (*quoting Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212, 118 S. Ct. 1952, 1956 (1998)). As the Supreme Court has noted, it is a mistake to

confine "the application of terms used in a broad sense to the relatively narrow class of cases that prompted Congress to address their subject matter." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 592 n.5, 124 S. Ct. 1236, 1243 n.5 (2004). "If the language of [CROA] reaches too far, it is for Congress-not the Court-to take corrective action." *Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F. Supp. 2d 539, 547 (D. Md. 2005).

The language Congress chose in defining a "credit repair organization" is self-consciously broad. The court cannot and will not judicially narrow the impact of the words used by Congress based on a general appeal to the purpose behind the statute. *See Nat. Coal Ass'n v. Chater*, 81 F.3d 1077, 1082 (11th Cir. 1996) ("[A] general appeal to statutory purpose [cannot] overcome the specific language of the Act, because the text of a statute is the most persuasive evidence of Congress' intent."). Accordingly, based on the facts of this case, the court finds that Credit Solutions is a "credit repair organization." Therefore, CROA applies to the transaction at issue between Picard and Credit Solutions.

## 2. Arbitrability Under CROA

Picard argues that CROA operates to make the arbitration clause in the customer enrollment package unenforceable. Specifically, she points out that the mandatory written disclosure statement, which must be provided to and signed by the consumer before any contract is executed, informs consumers that they "have

a **right to sue** a credit repair organization that violates the Credit Repair Organization Act." 15 U.S.C. § 1679c (emphasis added). She also points to CROA's non-waiver provision, which states that:

> Any waiver by any consumer of any protection provided by or **any right of the consumer** under this subchapter--
>
> > **(1)** shall be treated as void; and
> >
> > **(2)** may not be enforced by any Federal or State court or any other person.

15 U.S.C. § 1679f(a) (emphasis added). Based on these two sections, Picard argues that she has a right to sue under CROA that cannot be waived. Credit Solutions, not surprisingly, contends that CROA does not preclude arbitration. The parties principally rely on the reasoning contained in two recent district court opinions that come to opposite conclusions on the issue. Picard embraces the decision in *Alexander v. U.S. Credit Management, Inc.*, 384 F. Supp. 2d 1003 (N.D. Tx. 2005). However, Credit Solutions prefers the reasoning in *Rex v. CSA-Credit Solutions of America*, *Inc.*, 507 F. Supp. 2d 788 (W.D. Mich. 2007). After this motion came under submission, the Third Circuit weighed in on the matter in *Gay v. Creditinform*, 511 F.3d 369 (3d Cir. 2007). As far as the court can tell, the issue of arbitration under CROA is one of first impression in the Eleventh Circuit.

A party seeking to avoid arbitration of a statutory claim has the burden of establishing that Congress intended to preclude arbitration of the claim. *See Gilmer v. Interstate/Johnson Lane*

*Corp.*, 500 U.S. 20, 27, 111 S. Ct. 1647, 1652 (1991). If Congress has "evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue," it will be discoverable in the text of the statute, its legislative history, or from an inherent conflict between arbitration and the statute's underlying purpose. *See id.* (internal quotations and citations omitted). Throughout this inquiry, "it should be kept in mind that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Id.* (*quoting Mose H. Cone*, 460 U.S. at 24, 103 S. Ct. at 941).

While recognizing that reasonable jurists can disagree on this issue, this court aligns itself with the *Alexander* court's conclusion that "CROA's non-waiver of rights provisions, combined with its proclamation of a consumer's right to sue, represent precisely the expression of congressional intent required by" the Supreme Court to find that a waiver of judicial remedies is precluded. 384 F. Supp. 2d at 1011. The striking congruence of the language used in the disclosure provision, § 1679c, and the non-waiver provision, § 1679f, convinces the court that Congress intended to create a right to go to court under CROA that cannot be waived. To recognize that CROA voids all waivers of "any **right** of the consumer" and mandates that consumers be informed of their

"**right** to sue"[12] without also recognizing that any waiver of the right to sue is void strikes the court as embracing an **unhealthy** regard for the federal policy favoring arbitration. Reading § 1679c in conjunction with § 1679f provides simple but compelling evidence of congressional intent to preclude the waiver of judicial remedies.

The "right to sue" and non-waiver language used in CROA is different in important respects from other statutory language that has been found by the Supreme Court not to preclude a waiver of judicial remedies. For example, in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 228, 107 S. Ct. 2332, 2338 (1987), the Supreme Court held that the text of the Securities Exchange Act of 1934 did not preclude an agreement to arbitrate. The Exchange Act provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction of . . . all suits in equity and actions at law brought to enforce any liability or duty created by this chapter . . . ." 15 U.S.C. § 78aa. And, the Act's non-waiver provisions states that "[a]ny condition, stipulation, or provision binding any person **to waive compliance** with any provision of [the

---

[12] The suggestion by the courts in *Gay* and *Rex* that the "right to sue" language in § 1679c is generic, as opposed to referencing a specific right to sue under CROA, is undercut by the actual language of the required disclosure: "You have a right to sue a credit repair organization that violates the Credit Repair Organization Act." *See* 511 F.3d at 832; 507 F. Supp. 2d at 799. When the name of the Act and the statutory buzzword for the type of entities subject to the Act are mentioned in the same sentence referencing a "right to sue," there is a strong suggestion that the right to sue is specific to the mentioned Act, the same Act that creates all the other rights listed in the required disclosure.

Act] . . . shall be void." 15 U.S.C. 78cc(a) (emphasis added). The Court held that the Exchange Act only precluded waiver of the Act's substantive requirements, because it only prevents waivers of "compliance" with the Act. *Id.* The Court noted that the Act's jurisdictional provision does not impose any substantive obligations or duties on anyone--it merely serves a procedural function. *Id.* Therefore, the Court found that an agreement to arbitrate does not waive compliance with any provision of the Act. *Id.*

Similarly, in *Rodriguez De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481-83, 109 S. Ct. 1917, 1920-21 (1989), the Court held that the Securities Act of 1933 does not preclude arbitration. The jurisdictional and non-waiver language used in the Securities Act is virtually identical to that used in the Exchange Act, except that the Securities Act provides for concurrent jurisdiction in the state and federal courts, as opposed to the exclusive federal jurisdiction provided in the Exchange Act. *Id.* Relying on the same distinction between substantive provisions and procedural provisions that it used in *McMahon*, the Court held that waiving the jurisdictional provision does not fall under the prohibition against waiving "compliance" with the Act. *Id.; see also Cunningham v. Fleetwood Homes*, 253 F.3d 611, 622-23 (11th Cir. 2001).

23

Unlike the non-waiver provisions at issue in *McMahon* and *Rodriguez De Quijas*, CROA's non-waiver provision is not limited to the waiver of "compliance" with the Act. CROA simply voids the waiver of "any protection provided by or any right of the consumer under this subchapter." 15 U.S.C. § 1679f(a). Therefore, the substantive/procedural distinction has no application to CROA.[13] And, unlike the Exchange Act and the Securities Act, CROA includes the phrase "right to sue." There is a qualitative difference between vesting jurisdiction to hear a claim in a particular court and expressly providing that a consumer has a "right to sue."[14] By agreeing to settle all disputes in an arbitral forum, a consumer is necessarily giving up his or her right to sue, because arbitration is an alternative to litigation in a judicial forum--hence the term "alternative dispute resolution." *See Alexander*, 384 F. Supp 2d at 1011 ("There is no evidence that Congress intended courts to interpret 'right to sue' in a way that does not conform with

---

[13] In *Gay*, the Third Circuit used the fact that § 1679f is titled "Noncompliance with this subchapter" as a way to bootstrap the word "compliance" into CROA's non-waiver language. 511 F.3d at 385. However, "the title of a statute . . . cannot limit the plain meaning of the text. For interpretative purposes, it is of use only when it sheds light of some ambiguous word or phrase." *Yeskey*, 524 U.S. 212, 118 S. Ct. at 1956 (internal quotations, citations, and punctuation omitted). Because the text of § 1679f(a) is not ambiguous, the title of the statute is irrelevant.

[14] The *Rex* court makes a great deal out of the Supreme Court's holding in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 105 S. Ct. 3346 (1985), that an antitrust dispute under the Sherman Act is subject to arbitration; however, the Court's holding was not based on a textual analysis of the Sherman Act. Instead, it was predicated on "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes." *Id.* at 629.

standard legal usage."). It is well-recognized that "arbitration is a contractual right that is generally predicated on an express decision to waive the right to a trial in a judicial forum." *Becker v. Davis*, 491 F.3d 1292, 1299 (11th Cir. 2007) (internal quotations and citations omitted). In fact, "the purpose of the FAA was to relieve congestion in the courts and to provide parties with an alternative method of dispute resolution that is speedier and less costly than litigation." *Caley*, 428 F.3d at 1367 (internal quotations and citations omitted). Put simply, requiring a dispute to be resolved through binding arbitration is not compatible with CROA's nonwaivable right to sue.[15] Accordingly, the court finds that the arbitration clause in the customer enrollment package is rendered void.

*3. Fraud in the Factum*

Having decided that the arbitration clause itself is void, the court is not required to address Picard's claim that the contract as a whole is void as the product of fraud in the factum. However, the issue is too interesting to pass up in light of the jurisprudential tumult caused by recent Supreme Court precedent.

Picard argues that the customer enrollment package is invalid because she did not understand that she was signing a contract when

---

[15] Having found a congressional intent to preclude the waiver of judicial remedies under CROA in the text of the Act itself, there is no need for the court to examine legislative history or any inherent tension between arbitration and the Act's underlying purpose.

she electronically signed the agreement by clicking the "click here to sign" box at Englert's direction. She contends that Englert should have told her that the document she was electronically signing was a contract and that his failure to do so was fraudulent. Credit Solutions argues that the transcript of the phone conversation between Picard and Englert demonstrates that Picard's signing the customer enrollment package was not accidental and that she had every opportunity to read the agreement before signing it. As far as the court can tell, Picard was not limited to a set amount of time within which to read the contract. However, the court notes, as an aside, that someone who reads with the speed of a Jesse Owens in the 100 yard dash could not read the contract displayed on Picard's computer screen in 30 seconds, particularly with Englert salivating on the other end of the line.

The difference between fraud in the inducement and fraud in the factum[16] is important to the resolution of this issue. "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *See Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000). On the other hand, "[f]raud in the factum occurs when a party 'procures a[nother] party's signature to

---

[16] Fraud in the factum is also known as fraud in the execution.

26

an instrument without knowledge of its true nature or contents."
*Id.* (*quoting Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93,
108 S. Ct. 396, 402 (1987)). Fraud in the inducement merely makes
a contract **voidable**, but fraud in the factum results in the
agreement being **void** *ab initio. See Sandvik v. Advent Int'l Corp.*,
220 F.3d 99, 109-110 (3d Cir. 2000); *see also J.C. Bradford & Co.,
LLC v. Vick*, 837 So. 2d 271, 273 n.2 (Ala. 2002) (noting that a
contract induced through fraud is voidable); *Ex parte Majors*, 827
So. 2d 85, 90 (Ala. 2002) ("Fraud in the factum constitutes
ineffective assent to the contract."). "A claim of fraud in the
factum is a challenge to the very existence of the contract." *Ex
parte Majors*, 827 So. 2d at 91. If a contract is procured by fraud
in the factum, "there is no contract at all." *Cancanon v. Smith
Barney, Harris, Upham & Co.*, 805 F.2d 998, 1000 (11th Cir. 1986).
A voidable contract "is capable of being affirmed or rejected at
the option of one of the parties." Black's Law Dictionary 1605 (8th
ed. 2004). However, a contract that is void *ab initio* is "null from
the beginning." *Id.* at 1604.

In its seminal opinion in *Prima Paint Corp. v. Flood & Conklin
Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806 (1967), the
Supreme Court held that a court may adjudicate a claim of fraud in
the inducement of the **arbitration clause itself**, an issue which
goes to the "making" of an agreement to arbitrate under § 4 of the

FAA.[17] However, the Court held that the FAA "does not permit the federal court[s] to consider claims of fraud in the inducement of **the contract generally**." *Id.* at 404 (emphasis added). The Court's decision is based on the proposition that arbitration clauses are separable, as a matter of federal law, from the contracts in which they are embedded, and "that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Id.* at 402. In dissent, Justice Black noted his strong disagreement with the Court's holding in the following terms:

> The Court holds, what is to me fantastic, that the legal issue of a contract's voidness because of fraud is to be decided by persons designated to arbitrate factual controversies arising out of a valid contract between the parties. And the arbitrators who the Court holds are to adjudicate the legal validity of the contract need not even be lawyers, and in all probability will be nonlawyers, wholly unqualified to decide legal issues, and even if qualified to apply the law, not bound to do so. I am by no means sure that thus forcing a person to forgo his opportunity to try his legal issues in the courts where, unlike the situation in arbitration, he may have a jury trial and right to appeal, is not a **denial of**

---

[17] Section 4 of the FAA, 9 U.S.C. § 4, reads in pertinent part as follows:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

**due process of law.**

388 U.S. at 407, 87 S. Ct. at 1808 (Black, J., dissenting) (emphasis added). This court would agree with Justice Black's conclusion that "[i]f there has never been any valid contract, then there is not now and never has been anything to arbitrate," *id.* at 425, except for the fact that it is bound to follow the rule articulated by the majority in *Prima Paint* and expounded upon in later precedent.

In the aftermath of *Prima Paint*, many lower courts seem to have taken Justice Black's concerns to heart inasmuch as they construed the *Prima Paint* rule as narrowly as possible. Many courts applied *Prima Paint* to voidable contracts, but not to void contracts. *See Spahr*, 330 F.3d 1266, 1272 n.7 (10th Cir. 2003) (collecting circuit court authority drawing a distinction between void and voidable contracts in a variety of contexts); *Sandvik*, 220 F.3d at 105 ("*Prima Paint*'s holding addressed the effect of fraud in the inducement claims. It did not grapple with what is to be done when a party contends not that the underlying contract is merely voidable, but rather that no contract ever existed."). *But see Anniston Lincoln Mercury Dodge v. Connor*, 720 So. 2d 898, 902 (Ala. 1998) (citing to courts that have held that "the *Prima Paint* rule extends to all challenges aimed at the contract in its entirety"). The Eleventh Circuit has held that a claim of fraud in the factum "is not subject to resolution pursuant to an arbitration

clause contained in the contract documents," *Cancanon*, 805 F.2d at 1000, and noted that "*Prima Paint* has never been extended to require arbitrators to adjudicate a party's contention, supported by substantial evidence, that a contract never existed at all." *Chastain v. Robinson-Humphrey Co.*, 957 F.2d at 855. *But see Bess*, 294 F.3d at 1306 (holding that an attack on a deferred payment transaction as being illegal under state law, and thus void, is for the arbitrator, not the court). Likewise, Alabama courts have held that a claim of fraud in the factum is not subject to arbitration. See *Hudson v. Outlet Rental Car Sales, Inc.*, 876 So. 2d 455, 458 (Ala. 2003); *Oakwood Mobile Homes*, 773 So. 2d at 460. In *Mason v. Acceptance Loan Co.*, 850 So. 2d 289, 295 (Ala. 2002), the Alabama Supreme Court noted that:

> [W]e follow the reasoning of other courts that limit the holding in *Prima Paint Corp.* to 'voidable' contracts (e.g., a contract where a party is induced through fraud or a contract where a party is an infant). However, where a party challenges the very existence of a contract, that dispute must be decided by a court

However, in 2006, the Supreme Court swept away whole lines of precedent that had built up around the void/voidable distinction by reinforcing the *Prima Paint* rule and expanding it.

In *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S. Ct. 1204 (2006), the Supreme Court was faced with the question of whether a court or an arbitrator should consider the claim that a contract containing an arbitration clause is void for illegality.

First, the Court reaffirmed its holding in *Prima Paint*: "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-46. Then, the Court noted that the *Prima Paint* rule applies "**whether the challenge at issue would render the contract void or voidable.**" *Id.* at 448 (emphasis added). The Court admitted that its holding "permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void," but justified this seeming paradox on the grounds that a contrary rule would permit "a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Id.* at 448-49. The Court acknowledged the "conundrum" and "resolved it in favor of the separate enforceability of arbitration provisions." *Id.* at 449; *see also Preston v. Ferrer*, -- S. Ct. --, 2008 WL 440670 (2008).

While the Court's holding in *Buckeye* is sweeping, it does carve out a narrow exception through the insertion of an enigmatic footnote in which the Court notes that:

> The issue of the contract's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851 (C.A.11 1992), whether the signor lacked authority to commit the alleged principal, *Sandvik v. Advent Int'l Corp.*, 220 F.3d 99 (C.A.3 2000); *Sphere Drake Ins. Ltd.*

> *v. All American Ins. Co.*, 256 F.3d 587 (C.A.7 2001), and
> whether the signor lacked the mental capacity to assent,
> *Spahr v. Secco*, 330 F.3d 1266 (C.A.10 2003).

126 S. Ct. at 1208 n.1. One could argue that by carving out "the issue of whether any agreement between the alleged obligor and obligee was ever concluded," the Supreme Court left a door open for courts to consider the issue of whether a contract is void *ab initio* (*i.e.*, never existed) because of fraud in the factum. However, upon examining the cases cited in the footnote, it is clear that the exception only applies to challenges to signatory power, such as whether the contract was actually signed by the alleged obligor or whether the signor had the authority or mental capacity to undertake a contractual obligation. These types of challenges are categorically different from challenges based on fraud in the factum, where one admits that he signed a document but argues that he was mislead as to its character. As has been recognized by at least two other district courts in the aftermath of *Buckeye*, there are now three categories of challenges to arbitration provisions: 1) a challenge to the arbitration provision itself, 2) a challenge to the contract as a whole, and 3) a challenge to signatory power.[18] *See Larson v. Speetjens*, 2006 WL 2567873 at *3 (N.D. Cal. Sept. 5, 2006); *Fox Int'l Relations v. Fiserv Sec., Inc.*, 418 F. Supp. 2d 718, 723 (E.D. Pa. 2006).

---

[18] The Eleventh Circuit has described challenges to signatory power as being based on "arguments that a party never consented to such a contract." *Rintin Corp., S.A. v. Domar Ltd.,* 476 F.3d 1254, 1259 n.3 (11th Cir. 2007).

Challenges to the arbitration clause itself and challenges to signatory power are heard by a court, but challenges to the contract as a whole are decided by an arbitrator. *Id.*

The *Buckeye* Court's rejection of the distinction between void contracts and voidable contracts in the context of arbitration has been recognized by the Eleventh Circuit and the Alabama Supreme Court. *See Rintin*, 476 F.3d at 1259 ("The distinction . . . , between void and voidable contracts, was deemed irrelevant by the Supreme Court [in *Buckeye*]."); *Paragon Ltd., Inc. v. Boles*, -- So. 2d --, 2007 WL 4464880 at *6 (Ala. Dec. 21, 2007) ("[T]he United States Supreme Court made clear that [a distinction between void and voidable contracts in deciding whether to apply the holding of *Buckeye*] is irrelevant."). While neither court has yet to apply *Buckeye* in the context of a fraud in the factum claim, the rationale supporting the Supreme Court's holding in *Buckeye* leads this court inexorably to conclude that a claim that a contract containing an arbitration clause is void because of fraud in the factum must go to an arbitrator rather than a court.[19] Because the court has already determined that the arbitration clause at issue is void as a violation of CROA, Credit Solution's motion to compel arbitration is due to be denied.

---

[19] The same conclusion applies to Picard's claim that the contract as a whole is void because it violates CROA. *See* 15 U.S.C. § 1679f(c).

33

*Conclusion*

For the foregoing reasons, Credit Solutions's motion to dismiss or to compel arbitration is DENIED. Credit Solutions shall answer the complaint within 14 days unless it exercises its right to appeal. If it appeals, the court recommends that plaintiff cross-appeal to challenge the court's ruling that arbitrability was not destroyed by the invalidity of the contract. There should be something wrong with binding a person with her click to a lengthy electronically-displayed proposal after barely enough time to scroll to the clicking point, much less the time within which to read and comprehend it. The court would not mind being right for a wrong reason.

DONE this 26th day of February, 2008.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE